The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Our next case is 19-15-46, Stephanie Morris v. Lincoln National Life Insurance Company. Thank you, Madam Clerk. Mr. Glass, are you out there somewhere? I am, yes sir, I am. Good to have you with us, sir. And you represent the plaintiff in Ms. Morris? I do. We're pleased to hear from you. Thank you, sir. In this case, which is a life insurance case governed under ERISA, Lincoln abused its discretion by failing to even consider seven very discreet items of evidence that we submitted or pointed out in our post-remand submission and internal appeal of the case. And under ERISA, Lincoln is a fiduciary, and it's bound to act as a neutral, taking in facts and letting the chips fall as they may. And Lincoln's obligation is to thoughtfully consider, at least thoughtfully consider, the evidence that the claimant submits. And in this case, it ignored them completely. Now, remember the framework for the case, because although the record is very large, we have is the district court had found that Lincoln had abused its discretion sort of the first time around through the district court, and it remanded the case to Lincoln to solve one question. Was Stephen Morris totally disabled as that was defined in the policies on January 1, 2015? So that's really where this case that we hear today really starts at that point. It's really a new claim. And so as part of that process, we go back to Lincoln and we submit medical records and in the first round, narrative statements, trying to get Lincoln to focus on Stephen Morris's functionality, his ability to work at any job, even on a part-time basis on January 1, 2015. That's a single operative issue here. And so we point out to Lincoln, hey, Lincoln, look at the records from December of 2014 and early January and into January of 2014, and let's first look at the medical records. What does it say about Stephen Morris's ability to function? December 10, 2014 record, no new symptoms, feels well, except for mild fatigue. He's got a Karnofsky score, and I'll talk about the Karnofsky and the ECOG score in just a bit, but these are objective measures that oncologists use to assess a patient's ability to live life and to function. It's a language that oncologists use so that they can talk with each other. His Karnofsky score in December 10 was 80%, which is really good, can do sedentary work. December 30, like two days before the operative date, record generally feels well, unremarkable review of symptoms. Again, Karnofsky performance score 80%, and he's walking freely. Seven days into January, doing well, no new complaints. A different objective measure, the ECOG score is one, which means he's not able to do strenuous activity, but he's able to do sedentary to light duty activity. A week later, his only issue is he has a nosebleed that's on the 14th of January and the 28th, no abnormal symptoms. In February, he travels down to Texas to a cancer center for treatment. All the way up until August, remember he passes away in September of 2015, and even as of August of 2015, he's at the beach, he's taking walks, he's doing putt-putt golf. The second thing that we asked Lincoln to look at is, hey, we went and got narratives from friends and family, acquaintances, and said, tell us in a statement what you observed about Steve Morris's condition in this January 1, you know, this December to January period in 2014 and 15. I'll paraphrase, but basically, healthiest sick guy we ever saw. So we submit that to Lincoln and say, hey, pay attention, because Judge Trengus said, pay attention to January 1. As you know, these companies, you know, speak through their denial letters. So we get a denial of the claim. Lincoln finds that, oh no, he's not able, Mr. Morris is not able to do any work, even on a part-time basis, and they cite a couple of things. So number one, they do have an oncologist look at the case. The oncologist quotes in his opinion, it makes it into the denial letter, a purported statement by Mr. Morris's oncologist, Dr. Patel Donnelly. That statement, quote, Mr. Morris was unable to work at all due to his ongoing treatment and chronically low counts during this period from October, really, October 2014 to when he died in September. And Lincoln relies on this statement. That statement could, A, Dr. Hartner, the Lincoln oncologist, he doesn't get Dr. Patel Donnelly to verify it, as we often see in these cases. They'll send a letter, say, hey, is this what you actually said? This is what I heard you say. But that statement could be one of three things. It could be an opinion that he couldn't work at all. It could be an opinion that he couldn't work at his job, which- Can I ask, what was that opinion submitted for? So Mr. Morris got that opinion from the doctor and submitted it. What did he submit it for? So now what you're talking about is our reply, our appeal of Lincoln's initial denial. No, no, I think what I'm talking about, I'm just, I don't recall. That's why I was asking. Mr. Morris submitted his doctor's statement that he was unable to work for short-term disability benefits. So that's not what happened? Help me understand why not. Well, if what you're talking about is the Dr. Patel Donnelly statement that we just quoted, let's make sure you and I are on the same page. We're talking about that. Yes, sir? Yes, sir. Okay. That's a statement Dr. Patel Donnelly allegedly made in a phone call to Lincoln's oncologist, what we call a peer-to-peer call. So Steve Morris did not submit that statement. The statement that, again, that Lincoln relies on in their denial letter was a statement that their oncologist purportedly heard on a phone call- It was their oncologist's statement. It was his quote- That he said he heard from his oncologist. Correct, Judge King. And my point on this will be that we went back to Dr. Patel Donnelly because once Lincoln denied this claim, then we appeal, right? It's an internal appeal back up to Lincoln. We said to Dr. Patel Donnelly, hey, what if, first of all, did anyone talk to you about what not work means? No. What if the definition of disability was, what's in this policy was, do you think Mr. Morris in January, January 1, could have worked at an occupation even on a part-time basis? She said, yes, he could have. Now importantly, in our appeal back to Lincoln, we submitted, in addition to that statement from his treating oncologist, a letter from the employer that said, hey, if Mr. Morris had wanted to work from home, we would have had work available for him. Remember, the treatment he was getting for cancer made him highly susceptible to infection. A lot of the- So she said, is it correct that you're saying that she said she said was, I didn't understand when I made that statement what he meant by unable to work? What about Dr. Spira's statements? I had your doctors confused. Dr. Spira, on the short-term disability benefits, he or she said that he severely limited functional capacity, couldn't be expected to return to work till April, right? That's his own statement behalf of short-term disability. I mean, I don't know whether it's right or wrong, but it seems consistent with what the oncologist you just described later said. And both seem to provide some evidence that the story now is a little different. So Dr. Spira's statement is in an attending physician statement dated in October. Remember, that's when Mr. Morris was diagnosed and he was very sick. And judge, if the operative date that we were talking about here is October, October 15, then no, there's no coverage in the case and we lose, all right? But he started treatment. And all of the evidence around January 1 was that he had the capacity to do at least part-time work. And he had the educational background to do work. And so this is where it gets important because in addition to the Patel-Donnelly explanation, we submitted the saying, yes, if he had wanted to do this work from home, telework, we would have had work for him to do. Remember, he didn't need to do it because he had a good long-term disability policy. Judge Keenan. Yeah, thank you, Mr. Glass. Aren't you going to argue the distinction too between the two policies and their coverage and defining what is long-term disability? I mean, isn't that part of this case too? It is. It's not essential, all right? I will tell you that, yes. So there's two policies. There's a basic policy and a supplemental policy. What I'm concerned with is if we disagree with you regarding the record concerning his ability to work, it appears to me that you still have an argument under the policy language of the So I think it might be a good idea for you to at least spend some of your time addressing that. Let me talk about it. So yes, Your Honor, under the supplemental policy, it defined totally disabled as, and you have been unable to work for 180 days. The reason I say that's not essential and the court doesn't even need to go here is because my main argument in this case is that we submitted these seven pieces of evidence that Lincoln never even considered. They never addressed the narratives, the Patel-Donnelly clarification letter, the letter from the employer, the article from the American Cancer Society, and a vocational report. And ERISA requires two things. It requires a deliberate- No, no. I understand your question. I guess if I could tell you this is a friendly question, okay, on my part. It seems to me that in order to cover the basis, to have us consider the full range of territory here on appeal, that you need to mention at least the 180-day requirement for long-term disability in the supplemental policy, or you haven't covered all your bases. I kind of want to hear everything just so we can consider it all as a group. Under the supplemental policy, in order for Lincoln to prevail, as of January 1, Stephen Morris would have had to have been unable to work for 180 days because that was the definition of disability under the policy. And he was not diagnosed. He didn't get sick until October. So he had not been unable to work for 180 days. And I think I'm answering your friendly question. Well, I'm wondering, how did Judge Trenka go off the rails there? I mean, how did you address that in the district court? I addressed that in the oral argument that we had, and it's in the transcript. And in our brief, we cite to the page, we cite to the page that we addressed that. So I mean, how he didn't address that, or why he didn't, I don't know. But again, my fundamental point, though, Judge Keenan, is that we never actually reach, in my view, sort of the merits. No, no, I understand your point, but that was my point. Okay, sure. Thank you. Can you at least briefly address the issue exhaustion before the administrator? So I understand, I believe, the argument at the district court, and I think you sort of acknowledged below that you could have done a better job of it, but that you did raise it, and we can evaluate that. But talk to me a little bit about issue exhaustion before the administrator, because it seemed pretty clear that this issue never came up before the administrator. Were you required to do that? I may or may not have been, so I will agree with you, that issue, that specific legal argument never came up. My bigger ERISA principle point is that they didn't address anything that we sent in our appeal. And when you look at the report of the- Let me just back you up one second. Let me just ask it a slightly different way. All right. Do you agree that there is no issue exhaustion before an ERISA plan administrator? Answer's yes. Yes. Thank you very much. The point I would like to leave the court with, you know, as I sit down this first time, is JA-115 is the report of the nurse that provides the basis for Lincoln's final denial. It's really clear from that she never even got our appeal. She lists our prior appeals pre-remand. She doesn't mention any of the seven discrete bodies of evidence that we provided, and she doesn't discuss any. Then, of course, it doesn't make it into the denial letter. So if the court upholds Lincoln's procedure in this case, its unreasonable reasoning process, in my view, insurance companies are going to be able to say, look, you send it. We don't even have to discuss it. I'll sit down unless the court has any questions at this point. Thank you. You're saving some time for rebuttal. Yes, sir. Thank you. Mr. Decker? Thank you, Your Honor. Bernd Decker for the defendant, Lincoln National. I'm glad Mr. Glass mentioned fiduciary duties. It is very important to keep the perspective in mind here about Lincoln's duty to adjudicate these claims and strictly enforce the policy terms, and in this case, in this particular case, to look at this issue as if a finding of total disability on January 1, 2015, meant an award of benefits because it has to look at it the exact same way if it's deciding a claim for benefits as in this very unique situation with respect to this PIC provision. That is exactly what Lincoln did. It was not a difficult call. It was an extremely easy call, and that's why it's no surprise that every person who touched the file, at least five people at Lincoln, several people at Reliance Standard, all agreed that for the entire period we're talking about here, which is from when he left work to when Mr. Morris passed away so tragically, he was unable to do any sustained, consistent, reliable work activity for that entire time, including January 1, 2015. The fact is, I want you to get your word in on that piece if you like, but to follow Judge Keenan's guidance to your colleague, can you talk a little bit about the supplemental policy and in particular sort of three points, and I'll remind you if you don't keep them, but one is issue exhaustion before the administrator. Is there any reason to believe that there is, given the nature of that proceeding and the lack of any plan language suggesting that there is issue exhaustion? Second, what's your argument is that it was not raised before the district court? And then third, on the merits, how do you find 180 days to exist between October 15 and January 1? Yes, Your Honor, thank you. So the Gale case talks about the exhaustion requirement. Exhaustion is not a plan doctrine, it's a judicial doctrine, and there are very good reasons to require exhaustion because you don't want to become clear though that's administrative exhaustion, not issue exhaustion, right? So this is the Sims case from the Supreme Court in the agency context, but so I totally agree that there's administrative exhaustions required. There's a separate question about issue exhaustion, which is not Gale. That's right, Your Honor, and my contention is that there are good reasons to require, if you've got evidence, if you've got arguments, you bring it forward to the First Circuit. It has a case called Liston where they talk about the importance of bringing all your evidence and arguments so that the court does not become a substitute plan administrator, and now you're inserting yourself in a situation that Congress did not intend you to have. I understand the distinction. I think there are very good reasons to require someone to make those arguments, and here, you know, the plaintiff did not. He did not exhaust or preserve the district court either. There was none of the careful scrutiny that is required, but he raised it at oral argument for the first time, and he talked about it for 30 seconds or so. I mean, that is not the kind of preservation. Excuse me, Mr. Decker, you're saying. I'm sorry. What? The 180 days argument. Okay, but the contract is in front of the court though. It's part of the record. Right, Your Honor, and that's the issue with exhaustion. Again, he never raised the issue below the administrator, and he didn't preserve it in the district court. He only mentioned it at oral argument, and if you, in the first instance, take upon that issue yourself, you become a substitute plan administrator. It was contrary to what Congress intended. I understand that, but let me just understand on the district court point, right? So he comes to district court, and he says, listen, I was getting ready for argument. I realized this argument that I hadn't thought of before is pretty straightforward about it, and Lincoln didn't argue that the issue was waived, and the district court didn't find the issue was waived, and it was presented to the district court. Why would this court find the issue to be irrevocably waived in that situation? Well, I think the district court did consider it waived. He hadn't mentioned it in any of the briefs. He mentioned it briefly at oral argument. I think he requires... Where do I see the district court's decision that the argument was waived? No, no, he didn't. I think he considered it waived because he didn't address it in his opinion, Your Honor, and I think that was appropriate. Again, it wasn't preserved... But you're breaking lines on that. It was an implied decision by the district court? Well, again, I think he didn't consider... It wasn't preserved enough so that he was focusing on it. I mean, I think that's the point, but if I can move to the merits of it, Your Honor, I mean, the interpretation makes no sense. The total disability requirement under the LWOP provision of the supplemental policy has two requirements. You have to be and you have to be told it has to last for 180 days. What is the date that we measure the 180 days from? We're not talking about the Lincoln policy here. No, I'm asking you, Mr. Decker, a very simple question. What is the date from which we measure, for purposes of this appeal, the date from which we measure the 180 days? My point, Your Honor, is that you don't measure it. It's not part of the inquiry under the PIC. The only issue under the PIC is whether he is totally disabled. To find that totally disabled means totally disabled for 180 days is circular and would not serve the purpose of the PIC at all. What that would mean, Your Honor... But counsel, but counsel, wait a minute. Don't we have to go by the policy? If we find that it wasn't waived in the district court, how do we get beyond that clear policy language? The man didn't know he had acute myeloid leukemia until October, so he clearly didn't meet the definition of total disability in the supplemental policy. So the supplemental policy, Your Honor, says for this benefit, to get this benefit under the Lincoln policy, which, again, we're not talking about. We're talking about the Lincoln supplemental policy through the PIC. In order to get this benefit, if you're on the Lincoln policy, you've got to be totally disabled and it has to last 180 days. You don't merge the two. Right, but here's the challenge, and this is, you know, Judge Keenan asked, on what date, right? What are we judging it by? And we look at the PIC, failure to satisfy work rule, and it says, are not totally disabled on the date the policy takes effect. And I assume you agree the policy took effect on January 1st, right? That's right, Your Honor. What that means, and it's certainly not an arbitrary interpretation of it, what that means is, is he totally disabled? Not whether it has lasted for 180 days. That's what it means. No, total, totally disabled is capitalized. It's a defined term. That's correct, Your Honor. Terms on the previous page, which requires both the sickness piece and the 180-day piece. I mean, it has to include both because it's a defined term. Your Honor, that is completely certain. What that would be saying is that when we're looking at the PIC, we're going to take anybody on, on the Lincoln policy. You could be on your deathbed. You know, you could be on, you could be in a deathbed. We'll take you as long as you haven't been out of work for, for, for more than five months and 31 days. That is exactly contrary to what the PIC is trying to do. The PIC is trying, the PIC is trying... Well, help me understand that because I, I would have thought it's the opposite, right? I thought it made perfect sense. So tell me why that doesn't make sense. Because what the, what, what the PIC is trying to do, Your Honor, is to, is to make sure no one falls through the cracks. Not to have Lincoln taking on a claim that belongs on the other policy. The PIC is designed to determine which policy does this claim belong on. Your Honor, remember... No, no, but that's included under point one, right? So if it's already, it's already covered somewhere else, that's one thing, but that's not, that's part four of the failure to satisfy the active work rule. Your Honor, that person, that person who's on their deathbed, or, or, or Mr. Morris, uh, is entitled to an extension of life insurance benefits from, from the previous plan. Thus, he's not, he's not entitled to take advantage of the PIC. That person is, that, that's what the PIC is intended to do, Your Honor. It's intended to not have Lincoln taking on a risk that it can't price for and assess. Somebody who's on their deathbed, you know, after five, five months and is totally disabled, is entitled to take advantage of that reliant standard extension of life benefits plan. And that... Can you back that up for just a second? Let me make sure I understand your argument. Her argument is, okay, fine, on four, but we, we should find that, that Mr. Morris was entitled to an extension of life insurance benefits under the prior plan. He clearly, he clearly was, and that informs both three and four, Your Honor. How do, how do I know that on three? Tell me what I'm looking at to, to figure that argument out. I mean, I haven't, I just hadn't heard that argument yet. So where, how would I know that he's entitled to an extension of life insurance under the prior plan? The prior plan has the exact same extension of life insurance provision as the, as the Lincoln plan. That's a two, six, five, nine. So if you can do, you have to be unable to do any type of work for wage or profit, which you are capable of for your education and whatnot. It's almost the exact same, almost exact same definition. So again, Your Honor, this is not what the PIC was designed to allow some, what happened here is Mr. Morris chose to convert his, his, his policy. Had he filed a claim for LWOP benefits with Reliance Standard, they would have had to grant that, grant that claim. They would have had to. So the PIC- That's based on the extension of life insurance benefits that you, you represent as being substantially similar to the one that's found at JA-2659. Right. And so you have to meet the whole PIC together, Your Honor. So what it's trying to do is say, listen, if we're trying to figure out which policy this person comes in under, right? And if they're, if they're able to extend under the prior plan, that they're not going to be insured under Lincoln's plan. That doesn't make any sense. And again, to look at what's going on- The PIC provision doesn't say that, does it? The intent is clear, Your Honor. It's what you're Just one sec, Mr. Decker. What I'm concerned with is that your argument is addressing logic rather than policy language and that's not necessarily synonymous. Let me, let me make the point another way, Your Honor. So, so it's clear that the PIC is trying to, is trying to prevent someone from shooting, from falling through the gaps. You know, someone who's, who's not at work for a short period of time and dies before they can go back to work. It's what it's not, the intent is clear that it's not intended to give someone an opportunity to get something that they would not otherwise get if there was no change in character, in, in, in, in, in carriers. So that's exactly what's going on here. Can I ask a follow-up question? So if I wasn't going to find what you said I would find on 2659, do you have another, another suggestion where I could find an extension of life insurance provision? And if you do not have it with, with the, my colleague's agreement, I'd be happy to have you submit it by letter. But I just, I want to think, you say it's subject to it. I just want to see what I'm looking at and I'll try to find it my own. Sure, you're on the, the, the RSL policy is on, you know, it's 265, 2657, to 2662, 2663. I, I, and I can, so that, that's the RSL policy and I can pinpoint the, if I fail to give you the right policy. No, no, if it's, if it's in one of those pages, I can find it. That's okay. Yeah. So, so, so again, it's, it's not intended to, to allow someone to get something they could not get if there was no change in care, in carriers. So again, it's instructive to look at what would happen if there was no change in characters. There is no circumstance, your honors, that Mr. Morris could ever obtain $1.2 million in life insurance coverage from rights that accrue from the same plan. He couldn't have done that. What happened here is he chose to convert. You cannot convert and keep the group, the, the, the group, the group coverage. And Mr. Glass says, no, that's no, no big deal for people. It's a huge deal for people. The option to convert is extremely expensive. You're turning it into an individual policy. So you've got to pay those premiums. No one is ever going to choose to convert if they can extend the, the, the insurance under the prior plan. They won't, that makes no sense. You want to extend the group coverage as long as you possibly can. So if there was no change in coverage, someone in Mr. Morris's position would have filed that LWOC plan with RSL and RSL would have had to grant it, given what they said about this, about this, this man's situation on numerous times, you know, incapable of sustained frequent activity, incapable of sustained activity, sustained work activity on February and March, incapable of any sustained activities. RSL would have had to grant that claim. So what you said, and there are people who can't afford to convert. So what Mr. Glass is asking you to do is to find that someone in Mr. Morris's position who can't afford to convert is not totally disabled under the, under the, under this, under this plan. I mean, that's just not the case. Again, if, if, if Lincoln wanted to ignore whether the person was actually totally disabled as of the effective date, it would have said, listen, all you got to do is, all you got to do is apply within, you know, five months and 31 days of, of leaving work and we'll take you. That's not what the, the, the, the, the policy says, and it's not what it's intended to do. So, so here there was no loss, no loss whatsoever, because he was able to convert, he made that choice. He's not entitled to get more than he would have gotten had there been no, no change in carrier, in carriers. I mean, that, I mean, that's, in order to find that, again, you've got to agree with his interpretation of the, the definition of total disability, which, which also doesn't make any sense. The notion that you're only going to look at one day when everyone who looked at this file says he's incapable of sustained, reliable, consistent work activity. That's certainly not an, an arbitrary and capricious or unreasonable way to, to, to look at the, to look at the, the definition. And that's, you know, that's how everyone who, who touched the file looked at it. And, you know, no one who looked at it didn't. I mean, we talk about, you know, the evidence. Judge Trenka got, got this exactly right in terms of reviewing Lincoln's determination under the arbitrary and capricious standard. The, the, as Judge Richardson mentioned, Dr. Spinas APS in October, incapable of even sedentary activity. Dr. Patel Donnelly in, in, in December, unable to work at all until June of 2015. Mr. Morris himself on January 5th talks to RSL and says he can't do household activities. He's not going to be able to return to any occupation in, because, because there is, there is no remission. Again, as of, as of December 30th, he's in the office with Dr. Patel and she's telling him, you know, we don't even know if there's a clinical trial that you can participate in. I don't know, I'm not aware of any case anywhere ever where an insurance company said to a person in that situation, well, yeah, because you've had some good days in between your second failed therapy and your first clinical trial that, you know, that you can work and we're going to say no to your disability plan. And again, had he filed the claim with RSL, that's exactly what they would have done. They would have approved it as any insurance company would have. The, and Judge Treadmill went through the evidence and, and, and discussed these issues that Mr. Glass raised in terms of Nurse Sucha who, who considered everything. Nurse Sucha had, had access to the entire file, the referral to Nurse Sucha talks about in detail all of the information that Mr. Glass submitted on the appeal. She obviously reviewed that. She didn't find Dr. Patel-Donnelly's retraction of her prior opinion to be of, to be of any weight. And, and, and Judge Trent, Trent agreed, and I think so would anyone pursuant to the case law we said in our brief that talks about, you know, doctors who, you know, who switch their opinions. I mean, that's just not a weighty thing to, to consider. The procedural argument that there's some, some requirement to detail every piece of evidence, that's just not the case. The Department of Labor regulations say what has to begin a denial letter. You know, it has to be susceptible to judicial review. It has to have the reasons for the decision that you made and the policy provisions. The Supreme Court says in you don't have to explain your disagreements. So, and if you had that requirement, it would not be good. It would not be good for anybody because people, it would, it would incentivize claimants to just lard the file with stuff and then, you know, gotcha when, when there's no exact response. So I think that fails as well. It looks like my time is up, Your Honor. Is there any other questions I can answer? We appreciate your presentation, Mr. Decker. Mr. Glass, you have some time for rebuttal. So Steve Morris, he was not entitled to the extension of, of, of benefits under the reliance policy. He had converted. I have no idea whether that's expensive or not. It probably is. Mr. Decker's probably right. But the reality is that's, that's what he did. And importantly, when you look at Judge Trengas- I'm sorry, I'm sorry. Back, back up, Nassif. You, you said two different things. You said he was not entitled to extension. And then you said it was expensive, which are, which are not the same point. Tell me on the, so I, I understand the second point, but I'm less interested in it. Tell me why it is you think he was not entitled to any extension of life insurance under the prior plan? He had converted the policy and he had, and that policy had ended. And this is exactly why Judge- Converted which policy? I'm sorry. The, the prior policy, the reliance policy, it was coming to an end December 31. He would no longer be covered. Every employee at OG Systems would offer the chance, you can now buy an individual policy. He bought the policy from reliance. This is exactly what this, this argument that Mr. Decker just made is what Judge Trenga found to be an abusive discretion the first time around when, when Lincoln sent Ms. Morris on a wild goose chase to go get a letter from reliance saying he would not have been eligible for this extension of death benefit under the reliance policy. Judge Trenga said, of course he wasn't. He had converted the policy. The policy had- So where, where is that? Can you just, I just want to look at it. Where's the JA site? Or that's just the first Judge Trenga order is what you're- Yes, sir. It's a memorandum opinion and my assistant may be able to pull the page. I can find it. Thank you. Okay. Thank you. The second thing is, yeah, and I just want to go back and thank you for the questions about issue exhaustion. Remember, I think all of these people, claimants need lawyers to appeal these ERISA cases with their insurance companies, but the vast majority of them are not lawyers. And so to require a consumer to make, to exhaust legal arguments in his or her appeal back up the ladder with an insurance company, that, that's just not going to happen. And the reality is most of these cases are done by consumers without lawyers like, you know, points out, and Lincoln has argued about this case, that Mr. Morris self-declared himself unable to work and unable to do any job. And they, and they just ignore that the two days later, and this is at 1520, when he's filling out a form for reliance standard, and they ask, what can we do for you? And he says, I may be able to work. Again, this is January, January 7th. I may be able to work from home, do computer work with limited hours. But I heard the questions. My ask of the court would be, because you've used language in several unpublished opinions, like there must be a meaningful dialogue and the insurance company must, you know, like at least fairly address these pro-claimant issues that the claimant brings. My ask would be for a published opinion that makes this very clear, following other circuits that don't let companies like Lincoln, like get away with just ignoring this. My friend, Mr. Decker says, well, Narsucha reviewed and had, and he says, you know, had all this available to her. The court needs to be able to see the work in order to make an independent determination by the district court or you or this court, right? Of whether there was a rational and principled decision-making process. You can't find that work in this claim file and this record at all. So unless there's any other questions, we'd rest on our arguments and on our briefs and Mr. Decker and I are going to get on Zoom and have a beer with each other. Thank you, Mr. Glass, very much. The bill will be submitted and Madam Clerk will call the next case.
judges: Robert B. King, Barbara Milano Keenan, Julius N. Richardson